UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF
AMERICA

     v.

HAOYANG YU, *et. al.*,

     Defendants

CRIMINAL No. 1:19-cr-10195-WGY

**GOVERNMENT'S SUPPLEMENTAL MEMORANDUM OPPOSING
DEFENDANT'S MOTION TO DISMISS INDICTMENT DUE TO SELECTIVE
ENFORCEMENT AND PROSECUTION**

This Court is holding under advisement Yu's Motion to Dismiss Due to Selective Enforcement and Prosecution.  Dkt. No. 89 at 2.  The government respectfully submits this supplemental memorandum, as the Court invited at its hearing on October 7, 2020.  The government also respectfully requests that the motion be denied now.

Upon making its motion, the defense assumed the burden of demonstrating both a discriminatory effect and a discriminatory purpose.  Yet this court has already observed that, after extensive briefing and argument, the defense has failed to meet its burden for pre-trial discovery.  Dkt. Nos. 55, 56, 81, 84, and 89 at 3 (stating "[m]ore evidence is required" before the Court can determine whether the defense's information is relevant to the instant case).  The defense has not identified a group of similarly-situated actors who are of another ethnicity and who have not been investigated or prosecuted.  And it has not offered evidence that the government investigated or prosecuted this case because of the defendant's Chinese heritage.

The defense's failure to meet its burden requires denying the motion, not shifting the burden by asking the government to rebut the defense's inadequate claims.  Trial is not the appropriate venue to air whether the government engaged in discrimination.  None of the defense's arguments is a question for the jury, and none of the evidence supporting those

arguments is properly heard by the jury.  In contrast, if the defendant develops additional evidence in the future and wishes to renew his motion, then this Court could reconsider it.  But for now, the defendant has not made a showing that warrants anything but denial.

## ARGUMENT

### A.    The Rigorous Standard for Evaluating Selective Prosecution Claims

A successful selective prosecution claim must make two "demanding" showings.  *United States v. Armstrong*, 517 U.S. 456, 463 (1996).  First, the defendant must demonstrate that his prosecution had a discriminatory effect.  *Id.* at 465.  He does so by showing that similarly-situated individuals of a different race – or in this case, ethnicity – were not prosecuted.  *Id.* Second, the defendant must show that the government's prosecution was motivated by a discriminatory intent.  *Id.*  He does so by demonstrating that the government is prosecuting Yu "at least in part because of, not merely in spite of," the fact that he is of Chinese descent.  *Wayte v. United States*, 470 U.S. 598, 610 (1985).  As this Court is aware, the defense must offer "a credible showing" on each of these prongs before the court may grant discovery.  *United States v. Lewis,* 517 F.3d 20, 25 (1st Cir. 2008); Dkt. No. 89 at 3.  This standard is "rigorous" by design and "should itself be a significant barrier to the litigation."  *Armstrong,* 517 U.S. at 463, 468.

### B.    The Defense Has Failed to Demonstrate Discriminatory Effect.

Yu has failed to provide any evidence of the first prong of this inquiry – whether there has been any discriminatory effect in his case.  *Armstrong*, 517 U.S. at 469.  He has failed to do so because he has not identified even one similarly-situated actor of another ethnicity – much less a pool of them – who could have been but was not investigated or prosecuted.  Having failed to meet this burden, the defendant's motion must be denied.

#### 1.    A Similarly-Situated Offender Shares the Material Features of the Instant Defendant and His Case.

A similarly-situated offender is one outside the protected class who has committed roughly the same crime under roughly the same circumstances but against whom the law has not been enforced.  *Lewis*, 517 F.3d at 27 (citing *Armstrong*).  In determining whether offenders are

similarly-situated, an inquiring court should assess "every" factor that is "at least arguably material" to the prosecutorial decision. *Id.* "Material prosecutorial factors are those that are relevant – that is, those that have some meaningful relationship either to the charges at issue or to the accused – and that might be considered by a reasonable prosecutor." *Id.*

The facts of *Lewis* are instructive. There, the defendant – an African-American Muslim man – claimed that the district court had too narrowly defined the field of similarly-situated defendants when it denied his motion for selective prosecution. The district court had populated this pool with non-African-Americans and non-Muslims who had committed multiple misrepresentation offenses in connection with firearms paperwork, who posed a danger of violence, and who might have links to terrorism. *Lewis*, 517 F.3d at 26. The defendant argued that this configuration was "too specific." *Id.* at 28. He maintained that the pool should consist of people who had committed the same basic offense – "no more and no less." *Id.* at 26. The appellate court was unpersuaded. It ruled that each of the items that the district court used in its calculus was "relevant and material" to the prosecutorial calculation. *Id.* It also cited other courts that had similarly acknowledged the propriety of a prosecution targeting a defendant when he has violated a law many times and when his case implicates the specter of terrorism. *Id.* at 28.

These details are instructive in the instant case, which presents a multi-faceted prosecution for extensive criminal conduct. As described in detail below, the defendant's crimes are not the garden-variety trade secrets case, in which an employee takes some of his company's intellectual property with him when he leaves to work for a competitor. Yu's crimes are much more extensive, involving an array of federal statutes and implicating national security. *Lewis* requires that their breadth and character be reflected in any pool of similarly-situated defendants who have not been investigated or prosecuted. However, the defense has presented no such pool and, thus, has failed to meet its burden. Its motion must be denied.

### 2. The Material Features of the Instant Case are Uncommon.

There are several uncommon prosecutorial factors at issue in this case. Together, they create a constellation of facts, trade secret crimes, and other federal law violations that, given

their significance, warranted investigation and prosecution.  Under *Lewis,* any pool of similarly-situated defendants would also have to share these aggravating factors.

### a.  The Defendant Stole Technology Used in Military Applications.

First, the defendant is not only accused of stealing proprietary information worth many millions of dollars.  More troublingly, the Superseding Indictment also accuses the defendant of stealing some valuable information with important military applications.  In other words, while he was working at ADI, a defense contractor cleared for classified projects, Yu stole the plans to make computer chips of a kind used in various military systems, including radar, electronic warfare, satellite communications, and counter-surveillance.[1]  This dimension of the crime presents an obvious national security threat and immediately differentiates Yu's case from all others that the defense cites.

The defense never acknowledges this point.  Instead, it falsely tells this court that the government's description of the case is "either woefully uninformed or grossly misleading." Dkt. No. 81 at 13.  It presents the defendant as someone accused of stealing only the most "basic" product.  Dkt. No. 81 at 10.  "[T]he fact that nuclear warheads include screws and wires does not make those items into national security concerns," it states.  Dkt. No. 81 at 13.  Yet what the government describes here are not "screws and wires" that have no intrinsic national security value.  To the contrary, some of the chips that Yu stole can enhance the capabilities of military systems and are controlled by the U.S. government specifically for that reason.

For example, Superseding Indictment Counts 10 and 11 allege that the defendant possessed two files that matched – bit-for-bit – others on ADI's servers.  Dkt. No. 78 at 5-6, 15. These files contained the information needed to make three specific ADI chips that use gallium nitride (GaN) technology.  GaN is a semiconductor material that can efficiently amplify high

---

[1] *See, e.g.,* Military Embedded Systems. "GaN Adoption Solves Power, Performance Issues in Military Applications." Oct. 4, 2018.  Available at https://militaryembedded.com/radar-ew/rf-and-microwave/gan-performance-issues-military-applications.

power radio frequency signals and, thereby, enhance a system's range.[2]  The U.S. military places chips with this technology in jammers that allow fighter jets to fly undetected and soldiers to prevent the detonation of improvised explosive devices, often called IEDs.[3]  The U.S. has identified this latter capability, already deployed in Iraq and Afghanistan, as central to its future battle plans, which face an increasing likelihood of asymmetric warfare.[4]  "It is no surprise that the United States want to stop China and Russia getting hold of gallium nitride technology, which can boost the power and sensitivity of weapons systems while reducing their cost."[5]  In fact, this technology is so sensitive that, unlike many other ADI products, the United States government requires that these chips be manufactured only in the United States.

As just one specific example illustrating how this information relates to Yu's case, Superseding Indictment Count 11 alleges that Yu stole the plans for a part called HMC1086. This is a 25-watt GaN amplifier.  The file that Yu stole was dated October 15, 2012, and was actually marked "ITAR Restricted."  This was a reference to the International Traffic in Arms Regulations (ITAR), and indicated that the products inside had no known civilian applications. Since 2012, civilian applications for GaN technology generally and for this chip have expanded, and the government is not currently aware of the defendant having stolen items that are *only* used by the military.  Nevertheless, the HMC1086 still can be used in military applications.  That's why it falls under Section 3A001 of the Commerce Control List and why its export is regulated for antiterrorism and national security reasons.  This is also why the U.S. government requires that it be manufactured by a domestic foundry.

---

[2] International Defence, Security & Technology.  "Gallium Nitride (GaN) Technology Continues to Be a Game Changer for Military Radar, Electronic Warfare (EW), and Communications Applications."  Nov. 7, 2019.  Available at https://idstch.com/technology/electronics/gallium-nitride-gan-technology-continues-game-changer-military-radar-electronic-warfare-ew-communications-applications/.

[3] *Id.*

[4] *Id.*

[5] *Id.*

Clearly, this is not the kind of "basic component" that one might find in a typical trade secrets case or that is unworthy of the attention of the national security unit.[6] Dkt. No. 81 at 10. Nor is the HMC1086 the only GaN part whose information the defendant stole. At this time, the government is aware of at least two others contained in the files charged in Counts 10 and 11 alone. Yet the defense fails to present a single similarly-situated actor whose case shares this dimension. Its failure to do so also means it fails to meet its burden.

### b. The Defendant Readied Marketing Materials for this Military-Applicable Technology.

Second, the defendant stole this military-relevant information deliberately. The defendant may try to argue that, in his plundering the ADI product catalog of hundreds of confidential files, those related to GaN technology were accidentally scraped into his grab bag. But we know that is not the case here because the defendant then proceeded to create marketing materials for his own GaN technology chips. Continuing with the above example, the defendant created a datasheet for his own product, called the TM7052, whose specifications are very similar to the HMC1086. *See* Exhibit 1. Investigators found this datasheet and others like it when they executed a search warrant on a Google Drive account associated with the defendant. The datasheet features the Tricon MMIC logo, lists a Tricon email address and website, and refers to GaN technology. The natural inference here is that the defendant deliberately intended to increase the legitimacy and volume of his own business with at least the promise of this sensitive technology.

Moreover, the defendant did not steal this technology and then, as is more typical in trade secret cases, use it at an otherwise reputable company, where other compliance policies would

---

[6] In fact, the defense seems to suggest that stealing commercial-only trade secrets should never warrant criminal prosecution and should, instead, be addressed by civil complaint. But if that were the case, Congress would not have passed the Economic Espionage Act of 1996, which recognizes the importance of intellectual property to U.S. economic security. Further, the theft of even purely commercial semiconductors can raise national security concerns, because they can still be used by foreign militaries. For instance, the military of the People's Republic of China is targeting semiconductors in what is known as its "Military-Civil Fusion Strategy." *See* https://www.state.gov/wp-contact/uploads/2020/05/What-is-MCF-One-Pager.pdf.

have ensured that the information was handled in accordance with U.S. export controls and sanctions regulations. Instead, the defendant stole these plans and took them to his basement, where he ran his own illegal company for his own profit and advertised and marketed a catalog of stolen chips as part of that. The risk he posed, therefore, was much greater. This is another dimension that properly differentiates his trade secrets case from others.

### c. The Defendant Sold His Stolen Products Abroad.

Third, the defendant was exporting his stolen products to other countries. It is undisputed that the defendant sent portions of his loot to Taiwan, where his stolen chips were manufactured. However, the defense continually misstates evidence regarding the defendant's connections to China. It repeatedly claims in its papers and at oral argument that the defendant never sold property in China. *See, e.g.,* Dkt. No. 56 at 2 ("the investigation found no sales or shipments to China"); Dkt. No. 81 at 7 (referring to "no business or marketing operation in China" and stating that '[e]xhaustive investigation revealed no reason to believe that Mr. Yu sold his wares in China…"). That is incorrect. The government's investigation is ongoing. In reviewing the defendant's computer records, agents have determined that he did, in fact, sell some files to a company in China. Agents have also determined that he sold at least some chips to a Turkish company that described itself as having strong ties to the Turkish government. Investigators are continuing their forensic review of the defendant's electronic devices. As part of that process, they are determining whether he consummated transactions with Israeli and Indian companies, with which the defendant was also corresponding. Even if the agents discover no additional evidence, it is clear that the defendant's behavior – in personally exporting at least some of his boosted bounty overseas – differentiates this case from typical theft of trade secrets cases.

### d. The Defendant Violated U.S. Export Laws.

Fourth, some of the data that the defendant exported was controlled by U.S. export laws and regulations. In this case, some of the components that the defendant sold and the technology used to make those parts were controlled for national security reasons. Accordingly, exporting this technology to some countries and end-users requires a U.S. Department of Commerce

license.  Superseding Indictment Counts 21 and 22 charge the defendant with smuggling export-restricted technology to Taiwan without first obtaining the necessary export licenses and, thus, violating national security and foreign policy controls.  Dkt. No. 78 at 19.  To the government's knowledge, none of the civil cases that the defendant cites involves export violations.  For that reason alone, none presents a similarly-situated actor.

> ### e.  The Defendant Committed Some of These Crimes While Applying to Become a U.S. Citizen.

Finally, the immigration aspect of this case differentiates it from typical trade secret cases.  The defendant is accused of having stolen at least some ADI trade secrets while his application to become a United States citizen was pending.  Dkt. No. 78 at 11-12.  During his application process, the defendant repeatedly answered questions in which he denied having committed crimes for which he had not been arrested or that might otherwise disqualify him from citizenship.  *Id.*  Superseding Indictment Counts 23 and 24 allege that the defendant falsely answered these questions precisely because he knew that he would not obtain U.S. citizenship if he were honest about the illegal nature of his personal business.  Dkt. No. 78 at 21-22.  The government is unaware of this dimension in any of the defense's cited civil cases, and this differentiates Yu's case from a typical theft of trade secrets case.  The United States obviously has a heightened interest in investigating and prosecuting a foreign national who lives as a guest in this country and does, indeed, become a citizen while he is exploiting millions of dollars in stolen private property, some of which has national security implications.

> ### 3.  The Defense Presents No Pool of Similarly-Situated Yet Unprosecuted or Uninvestigated Actors.

These facts make clear why the United States is investigating and prosecuting Yu.  Contrary to the defense's assertions, no discriminatory intent animates this case.  Instead, the severity and breadth of the defendant's criminal conduct has driven it from the very beginning.

In addition, the defense has not identified any discriminatory effect.  It has failed to produce any evidence supporting the first prong of a selective prosecution inquiry because it

cannot identify a group of similarly-situated, non-Chinese Americans who have not been investigated or prosecuted.  To be frank, this makes sense: The government takes its obligations seriously.  If it were aware of other people who so broadly and brazenly stole millions of dollars in property – some with military applications, smuggled some of this data out of the country, founded their own businesses upon this work, sold stolen products to domestic and international customers, and then lied about it to gain U.S. citizenship, the government would investigate those people – as it has here – regardless of their races or ethnicities.  After those investigations, decisions to prosecute would be based on the merits of each case, but this arrangement of aggravating factors suggests that, if possible, the government would pursue criminal charges. The government is unaware of a class of individuals who fit the above description and who have not – at a minimum – been investigated.  Moreover, it is the defense's burden to identify such a class of individuals, if it exists, and bring it to the court's attention.  Here, the defense has not marshaled a single case whose prosecutorial factors match those in the instant matter.  This failure alone means the defense has not met its burden.

The defense might complain that the description above is too specific: How, it might ask, could it possibly identify a case that would meet the many prosecutorial criteria present in Yu's case?  The government's reply is two-fold.  First, the law requires not merely one comparative case.  Rather, it requires more than a few, because there will always be examples where deserving individuals escape prosecution for a variety of innocuous reasons, including the lack of a criminal referral to law enforcement or limited resources.  *United States v. Tibbetts*, 646 F.2d 193, 195–96 (5th Cir. 1981).

Second, and more important, *Lewis* makes clear that, in creating a pool of similarly-situated defendants, courts are to consider a set of cases that share "every" factor that is "at least arguably material" to the prosecutorial decision.  *Lewis*, 517 F.3d at 27.  *"No fact should be omitted to make it out completely."  Lewis*, 517 F.3d at 17 (citing *Armstrong*) (emphasis in original).  Here, the government has named several factors.  Each is material to the prosecutorial decision, because each was an aggravating circumstance that made the defendant's conduct

egregious enough to warrant, at a minimum, criminal investigation. Thus, under First Circuit law, a pool of similarly-situated actors should share these features. This burden is, indeed, "rigorous," and the government recognizes that, in this particular case, it may be difficult for Yu to meet this burden. *Armstrong*, 517 U.S. at 457. To the government's knowledge, there are not many people willing and able to commit the kind of brazen and serious crimes of which the defendant is accused; thus, there are not many people available to populate the comparison group and, therefore, to demonstrate discriminatory effect. In reality, that is a good thing, though inconvenient for the defense's selective prosecution and enforcement argument. But that inconvenience is not the fault of the government, and it does not shift the burden to the government to prove its case prior to trial – or to rebut the defendant's claims at trial. Again, the defense has failed to meet its burden, and thus, its motion must be denied.

Finally, the government notes that the absence of similarly-situated actors does not mean that the government had a discriminatory intent. To the contrary, their absence is evidence of the righteousness of the case itself.

### a. The MACOM Case Does Not Offer Similarly-Situated Actors.

The defense makes a detailed comparison of this prosecution to only one other case: *Analog Devices, Inc. v. MACOM Tech. Solutions Holdings, Inc.*, No. 18-cv-11028-GAO (D. Mass.) (MACOM Suit). In that civil action, Yu's former employer, ADI, sued another company for patent infringement, trade secret misappropriation, and unfair and deceptive trade practices. MACOM Suit, Dkt. No. 1. The defense's reply brief and oral argument relied heavily on this case in its attempt to demonstrate a discriminatory effect. However, the MACOM suit is dissimilar both in the nature of its claims and in its absence of aggravating factors.

First, this criminal prosecution and the MACOM civil suit allege different kinds of wrongs. Most notably, the MACOM suit alleged patent infringement. This separates it from the instant case: Patent holders are required to defend their rights or risk losing the privileges those patents provide. Thus, infringement suits are almost always brought by private companies against their competitors. Typically, the cases are resolved when the competitor pays the patent

owner for the right to use its protected property in manufacturing the competitor's product.  This context is important because it helps demonstrate that the MACOM suit was not brought because ADI sat down, reviewed its budget and prosecutorial priorities, decided the MACOM bad actors were among the worst they could successfully sue, and chose to file a claim.  To the contrary, ADI – like most other companies in its position – likely filed suit out of necessity to protect its patents and trade secret property.  In short, ADI did not engage in a prosecutorial analysis, but that *is* what happened when the government pursued a criminal case against Yu.

Second, following its prosecutorial analysis, the government then pursued this case specifically because of its aggravating factors, none of which seems present in the MACOM suit.  The defense is disingenuous when it tells this Court that "the MACOM defectors stole far more data than Mr. Yu is charged with taking."  Dkt. No. 81 at 11.  The defense knows that it is impractical for the government to "charge" Yu with every file that he stole.  *Id.*  A computer forensic expert recently reported that the personal electronic devices seized from Yu's home contain thousands of GDS files that originated from ADI's property.  The few that have been selected for charging are illustrative; they could not and do not purport to encapsulate the entirety of his criminal conduct.  Thus, the defense's comparison of the scale of Yu's criminal conduct to that of the MACOM employees is not accurate or helpful.  From the public filings, which are the source of almost everything the government knows of the MACOM case, it seems that its bad actors – like Yu – stole a significant amount of data.  Any difference beyond this is not material to a prosecutorial analysis.

What is helpful to this analysis is other information indicating that, in contrast to the instant one, the MACOM case – to the extent that it is a trade secrets case – is more typical.  There, several ADI employees took information with them when they assumed new positions at MACOM.  But there is no suggestion that MACOM's bad actors were in the process of becoming U.S. citizens when they stole ADI's files.  Similarly, there is no suggestion that they later concealed this information from federal officials in an effort to secure U.S. citizenship.  Finally, there is no information suggesting that MACOM's bad actors personally violated export

controls by sending their pilfered information to foreign countries without obtaining required export licenses. The government is aware that MACOM's commercial division has offices in China. Dkt. No. 81 at 11-12. However, as a defense contractor cleared to work on classified projects, MACOM is regularly audited and inspected to ensure its compliance with U.S. export laws and regulations, and there is simply no suggestion that MACOM was violating these export controls. Thus, the mere fact that ADI sued MACOM for trade secret theft does not raise the same concerns as Yu's activities do. Precisely because Yu was running his own fraudulent, small shop, with no oversight or accountability, he posed a greater national security risk than the MACOM bad actors did. And in contrast, we know that Yu did export controlled technology without obtaining the required licenses.

In conclusion, unlike the defendant's case, the MACOM civil suit did not involve similar offenses. Also, the defense has not demonstrated that the aggravating factors present in the instant case were also present in the MACOM litigation, and to the government's knowledge, they were not present. Therefore, the MACOM defendants are not "similarly-situated," and their case cannot be used to demonstrate discriminatory effect.

### b. The Civil Cases Do Not Present Similarly-Situated Actors.

More generally speaking, none of the state and federal civil cases that the defense cites is comparable here. *See* Dkt. No. 56, App'x A. The very nature of these suits – their motivations, logistics, and standards – are dissimilar from federal criminal cases. Without additional information, which the defense has not provided, there simply is no way to evaluate the evidence or the aggravating factors that might qualify any of these cases as worthy of U.S. Attorney's Office (USAO) interest.

First, civil matters are private lawsuits filed without government notice or involvement. When a private party lodges a suit, it uses the courts to redress injury, but the USAO and federal investigative agencies are not notified. The government has no reason to know of the existence of these cases, much less of their details, unless the government happens to be investigating the same case or has received an independent report. Here, the defense offers no evidence that any

of its listed civil cases was referred to the government and declined.  Thus, none demonstrates that a similarly-situated actor could have been investigated but was not.

Second, for a variety of ethical, strategic, and logistical reasons, criminal prosecutors are usually reluctant to initiate their own investigations after a civil action has begun.  Generally, civil suits follow criminal prosecutions, where the burden of proof is higher.  Therefore, unless a private party reports suspicious behavior to the authorities before it seeks civil redress, it is unlikely that any investigation will take place.  Exceptions can be made for egregious conduct, of course.  But the defense offers no details about its list of civil cases, much less the kind of detail indicating that those cases should have been investigated.  And the government has not reviewed the facts supporting any of their accusations.  Therefore, though the defense breezily asserts that a criminal case would have been "easy to bring, and to win" in the MACOM suit, the government cannot comment on whether the evidence in that case – or any of the others – would have supported a criminal prosecution.  Dkt. No. 81 at 11.  The government can specifically state that the MACOM theft was not reported or referred to the USAO prior to the civil suit's filing,

Third, the detail that the defense fails to provide is essential, because successfully prosecuting a federal criminal trade secrets theft case is much more difficult than obtaining a civil settlement in federal or state court.  Much commercial information is sensitive – even valuable – but does not qualify as a trade secret.  Finding cases where the evidence meets this standard and where companies have taken reasonable steps to protect the information, as required by statute, is the exception, not the rule.  Prosecutors must also find victim companies that are willing to cooperate, which is not a given: Victims sometimes fear, for example, that "inviting a criminal investigation and prosecution will increase the likelihood of the trade secret becoming publicly revealed during investigation or at trial."[7]  In addition, trade secret cases are, by their nature, often technical and complicated, requiring significant resources and time to

---

[7] American Journal of Trial Advocacy. "Your Secrets Are Safe with Us: How Prosecutors Protect Trade Secrets during Investigation and Prosecution." Vol. 38:461 at 463. Available at https://www.justice.gov/criminal-ccips/file/640271/download.

investigate and prosecute.  All of this places a heavy burden on the government and helps explain why, despite the government's commitment to prosecuting serious federal criminal trade secret cases, there are typically fewer than 10 filed nationwide each year.[8]

Fourth, the defense admits its civil lawsuit lists are incomplete.  It calls them "illustrative examples" and "not a complete catalogue."  Dkt. No. 56, App'x A at 1.  But it offers no information on the number or nature of the lawsuits that it has excluded.  And it offers no explanation for why, when Massachusetts is one of the few states imposing criminal liability for improperly acquiring trade secrets, it has not collected data on state cases alleging violations of Mass. Gen. Laws. Ch. 266 § 30.  The defense's civil list is useless for establishing any statistical reality and does not establish any relevant fact.  It should not be used to do so.

In short, the defense has not demonstrated that any of the alleged bad actors in its civil cases are a similarly-situated defendant.  The defense's incomplete list, which contains no information about the racial, ethnic, or national identities of any of the named defendants – or of those not included, does meet the defense's burden.

### c.  The Defense Falsely Cites USAO Press Releases.

The defense mentioned in its briefing – and then raised at oral argument – press releases issued by the USAO.  The defense claims that these releases "[confirm] the discriminatory targeting of persons of Chinese descent who are alleged to have stolen trade secrets from U.S. companies."  Dkt. No. 56 at 7.  The defense is wrong.

To begin, most of the press releases that the defense lists do *not* relate to trade secret cases.  *See* Dkt. No. 56-2, p. 30-40.  Contrary to the defense's description, only one press release even alleges a trade secret theft offense.  This release relates to *United States v. Dong Liu*, 1:17-

---

[8] *See, e.g.,* Perkins Coie. "Criminal Trade Secret Prosecutions Under Trump – One Year Later." June 14, 2018.  This review found that the Department of Justice brought an annual average of fewer than 10 criminal cases under the Economic Espionage Act between its passage in 1996 and 2016.  The review also noted no change in the rate of prosecutions in the first year of the Trump administration. *See* https://www.perkinscoie.com/print/content/25654/criminal-trade-secret-prosecutions-under-trump-one-year-later.pdf.

mj-06232-MPK-1, in which a dual Canadian/Chinese citizen was charged with attempting to steal trade secrets and computer information from a medical technology company. *See* Dkt. No. 56-2, p.33-34. Aside from the instant matter, *Liu* is the only trade secret case charged in this district since 2013. The United States concedes that the defendant in that case was a dual Canadian and Chinese citizen. But that in no way demonstrates what the defense needs: a similarly-situated defendant who was *not* charged. First, Liu was charged. Second, Liu is not similarly-situated, because the scope of his criminal conduct does not resemble the instant defendant's. Liu was accused of stealing trade secrets, but – in addition to that – Yu is accused of stealing information used in military applications, exporting stolen information, and lying about his activities in order to obtain U.S. citizenship.

Contrary to the defense's describing them as trade secret matters, most of the cases that the defense lists are actually export cases, in which the defendants were accused of illegally exporting military electronics or biological material to other countries. The defense lists one of these cases – *United States v. Zhen Zhou Wu, et. al.* (1:08-cr-10386 PBS) – twice. It cites one press release relating to Mr. Wu's sentencing and a second press release relating to his ex-wife, Yufeng Wei. Dkt. No. 56-2, p. 37-40. The couple were charged as co-defendants 12 years ago and convicted of exporting military electronics to China. The second export case is *United States v. Sihai Cheng, et. al.* (1:13-cr-10332-PBS), in which the defendant was convicted of causing the unlawful export of U.S. goods to support Iran's nuclear program. Dkt. No. 56-2, p. 35-36. Finally, the defense cites a press release featuring three separate cases lodged in early 2020. *See* Dkt. No. 56-2, p. 30-32. The defendants there were charged variously with making false statements, visa fraud, smuggling, and acting as an agent of a foreign government.

The point is that none of these cases is sufficiently like the instant defendant's – which, frankly, involves a relatively unusual concentration of many of the various crimes listed in the cases above. None of the other cases identifies a single defendant accused of committing Yu's panoply of violations, and none identifies a similarly-situated actor who was *not* charged.

### 4.  This Court Should Not Abandon Circuit Precedent.

In its reply brief and at oral argument, the defense invited this Court to depart from First Circuit precedent and apply a new standard for allowing discovery in a selective enforcement claim.  It wrongly told this court that "only proof of one" – either discriminatory effect or discriminatory intent – "is required to proceed" with Yu's claim.  Dkt. 81 at 1.  The Court should not take this approach.  It is wrong for at least three reasons.

First, none of the cases the defense cites controls in the First Circuit.  This is dispositive because a court within a particular circuit is bound to follow circuit precedent directly or closely on point.  *United States v. Guzman*, 419 F.3d 27, 31 (1st Cir. 2005).  In this case, the law most closely on point is that described in *Lewis*, whose language is crystal-clear: A "defendant must present 'some evidence' tending to show both discriminatory effect and discriminatory intent…. [D]iscovery will not be allowed unless the defendant's evidence supports each of the two furcular of his selective prosecution theory."  *Lewis*, 517 F.3d at 25 (internal citations omitted).  *See also United States v. Magana,* 127 F.3d 1 (1st Cir.1997).  Here, the defense does not provide sufficient evidence tending to show either discriminatory effect or discriminatory intent, much less both of them.  Thus, under *Lewis*, discovery should not be allowed.

Further, as the court observed at argument, there is no First Circuit law distinguishing discovery standards in selective prosecution and selective enforcement claims.  The defense does not cite any First Circuit cases that discuss the legal doctrine of "selective enforcement" in a criminal context.  The government could find not find any either.  The closest it came was a mention in a non-binding magistrate court decision from more than 20 years ago.  *See United States v. Tuitt*, 68 F. Supp. 2d 4 (D. Mass. 1999) (granting some discovery in a selective prosecution claim).  There, the court briefly mentioned "both the prosecutorial and law enforcement sides of the litigation." *Tuitt*, 68 F. Supp. 2d at 15.  It went on to provide a single sentence stating that, for example, investigators or police authorities might discriminate in a referral to the USAO even when a prosecutor had no discriminatory intent in seeking the subsequent indictment.  *Id.* at 15.  But the court did not describe the first half of this continuum

as "selective enforcement."  Instead, it characterized the entire inquiry as one involving

"selective prosecution."  *Id.* at 18 ("[T]he court is not finding that the prosecutors, on the one

hand, or law enforcement agents, on the other, did in fact engage in selective prosecution.")  And

it certainly did not find that a different standard applied when the defendant was focusing his

challenge on the investigatory phase of his prosecution.  In short, there is no First Circuit law

that establishes a new standard for discovery in selective prosecution claims or that even

acknowledges the nomenclature of selective enforcement in a criminal context.  This court

should not depart from circuit precedent and create one.  Instead, it should apply the law as

settled by *Lewis* and its predecessors, including the Supreme Court's decision in *Armstrong*.

Second, the non-binding, out-of-circuit cases modifying the evidentiary burden for

discovery motions in selective enforcement challenges mostly involve very specific facts not at

issue here.  They relate to stash house reverse-sting operations, in which federal agents pose as

disgruntled drug couriers and then attempt to recruit targets who agree to burglarize fictional

drug supplies.  Several of the out-of-circuit holdings, including at least one cited by the defense,

are specifically restricted to stash house reverse-sting defendants.  *See, e.g., United States v.

Sellers*, 906 F.3d 848 (9th Cir. 2018) (restricting its holding to defendants "in a stash house

reverse-sting operation case"); *United States v. Lopez*, 415 F. Supp. 3d 422, 427 (S.D.N.Y. 2019)

(restricting its holding to defendants in "reverse-sting operations").  Obviously, the instant

defendant was not the target of a stash house reverse-sting operation; he was not the target of any

sting operation.  Instead, at least a year after he had begun his criminal conduct, industry

representatives reported concerns to authorities, who followed up with a competent shoe-leather

investigation.  The specific circumstances for which these out-of-circuit courts modified their

evidentiary requirements are not present in the instant case.  The cited decisions are not relevant

and should not be relied upon to change the law here.

Third, in contrast to the defense's presentation, even when out-of-district cases don't

restrict their holdings to stash house reverse-sting operations, they don't present a new, clear,

uniform, discovery standard.  "Nor have they been precise about how much discovery should be

permitted.  Rather, these courts have left district courts to determine whether and how much discovery is warranted on a case-by-case basis." *Lopez*, 415 F. Supp. 3d at 427.  For example, the Seventh Circuit simply remanded a case to receive additional evidence and then to have the district court decide what additional inquiries might be appropriate.  *United States v. Davis*, 793 F.3d 712, 723 (7th Cir. 2015).  Notably, the circuit cautioned that the information learned during those inquiries should "satisfy the *Armstrong* criteria" before discovery expanded to the prosecutor's office.  *Id.*  Here, the defense is far from satisfying those criteria.  In contrast, the Third Circuit said that district courts retained "the discretion to conduct a limited pretrial inquiry into the challenged law-enforcement practice" when the defense presented a "proffer that shows 'some evidence' of discriminatory effect."  *United States v. Washington*, 869 F.3d 193, 220–21 (3d Cir. 2017).  It required this proffer to contain "reliable statistical evidence, or its equivalent" and cautioned courts to proceed mindful that the defense must ultimately meet an undiminished standard for proving selective enforcement.  *Id* at 221.  Here, the defense has not provided "reliable statistical evidence."  *Id.*  By its own admission, its list of civil cases is "illustrative" only and, therefore, does not provide a dataset that could be used in statistical analysis.  Dkt. No. 56, App'x A at 1.  The rest of its data, including misleadingly cited press releases and law review articles, does not rise to this level either.

The larger point is that the defense presents the idea of this out-of-circuit law as a clear way forward.  In reality, these cases are anything but clear.  They vary; their typical facts are not at issue; and they are not monolithic.  At least one other circuit, the Tenth Circuit, has explicitly stated that, for a selective enforcement claim, the elements are "essentially the same" those articulated in *Armstrong*.  *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1264 (10th Cir. 2006).  In conclusion, this Court should not be tempted to depart from its own precedent and reduce the defense's burden when the defense has failed to meet the established one.

### C.    The Defense Has Failed to Demonstrate Discriminatory Intent.

Yu has also failed to provide any evidence of the second prong on this inquiry – whether there has been any discriminatory intent.  *Armstrong*, 517 U.S. at 469.  To do so, Yu must make

a "credible showing" that the government's allegedly discriminatory prosecution has been "invidious or in bad faith." *Lewis*, 517 F.3d at 25; *United States v. Olvis,* 97 F.3d 739, 743 (4th Cir. 1996) (citing cases).

Here, the government relies principally on its previous briefing. But in addition, it stresses one point: This case is not part of the China Initiative. It has never been described as such by the USAO. In response to two completely independent industry reports submitted in December 2017 and January 2018 from opposite ends of the country, this case was opened nearly a year before the Department of Justice created and announced the China Initiative. By the time of that announcement, November 2018, this was a mature and complex multi-agency investigation preparing to obtain its first search warrant; subpoenas had been issued; and numerous interviews had been conducted. It is simply factually incorrect to tie this case to the China Initiative, which post-dates the investigation and prosecution. It is also inappropriate to tie this case to any of the political rhetoric surrounding that China Initiative.

### D.    Trial Is Not an Appropriate Venue in which to Determine Whether the Defense Has Met Its Burden.

This court should deny the defendant's motion now: The defense chose to bring the motion at this time and, thus, to assume responsibility for meeting its evidentiary burden now. The defense knew in advance that this burden would be "rigorous." *Armstrong*, 517 U.S. at 468. It has nevertheless failed to meet that burden. The law requires denying the motion.

The Court observes much of this in its recent Order, where it writes that, "[t]o justify pre-trial discovery," the defendant "bears the burden of demonstrating that the Government's enforcement of a law has both a discriminatory effect and a discriminatory purpose." Dkt. No. 89 at 3 (citing *Armstrong*.) The Court then declines to grant pre-trial discovery, thus implying that the defense has not met the burden. Dkt. No. 89 at 2. Instead, the court says that it needs "[m]ore evidence" before it can determine whether the defense's alleged evidence of selective prosecution is relevant to this case. Dkt. No. 89 at 3. It concludes by suggesting that the trial

will provide such evidence – principally by allowing the government to demonstrate that the defendant's case is not, in fact, similarly-situated to others the defense cites.  Dkt. No. 89 at 4.

Respectfully, such an approach allows the defense to escape its burden.  This is unfair for at least three reasons.  First, it is not fair to the defendant to require a trial if, in fact, he has met his burden.  Second, a Grand Jury has found that there is probable cause to believe that the defendant has committed the crimes as alleged in the Superseding Indictment.  The language there – in the recitation and the counts themselves – describes the aggravating factors that differentiates Yu's case from others.  On this basis, the government has shown that its claims are grounded in fact.  Requiring it to do more is shifting the burden of the defendant's motion onto the government, even though the government – rightly – has no evidentiary obligation here.  Third, trial is not the appropriate venue to air whether the government engaged in discrimination.  By its nature, a selective prosecution claim "is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecution brought the charge for reasons forbidden by the Constitution." *Armstrong*, 517 U.S. at 463.  Because this claim is not based on the merits of the charge, none of the defense's arguments or purported evidence on this issue is a question for the jury.  Indeed, even allowing the jury to hear arguments on this issue would mislead the jury and unfairly prejudice the government.  It is not advisable to go to trial with this matter unresolved and allow the defense to present it to the jury as an open question.

The government respectfully suggests that a better approach would be to find that the defense has not met its burden and to deny its motion.  If the defense is able to develop new evidence at a later time, then it could raise a new motion.  This approach would acknowledge that the defense has not met its burden at this time and, thus, properly allow the prosecution to proceed.  It would allow the defendant to raise another motion if new evidence is developed – even prior to trial.  It would also allow the court and the jury to hear the evidence against the defendant without irrelevant and potentially inflammatory distraction.

## **CONCLUSION**

In conclusion, the defense has not met its burden for discovery: It has failed to provide sufficient evidence of either discriminatory effect or discriminatory intent. The defense's requests for dismissal, discovery, and a hearing should be denied.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:    /s/ Amanda Beck
Amanda Beck
Jason A. Casey
B. Stephanie Siegmann
Assistant United States Attorneys
617/748-3683

## **CERTIFICATE OF SERVICE**

I hereby certify that these documents filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

_/s/ Amanda Beck_____
Amanda Beck
Assistant United States Attorney

Date: October 28, 2020